MILLER, Judge.
In this suit for declaratory judgment, plaintiff Louisiana Intrastate Gas Corporation appeals the trial court’s cancellation of its Gas Purchase Contract and Liquifiable Hydrocarbon Purchase Agreement with defendant F. J. Muller. The basis of cancellation was the holding that LIG had not timely paid for gas delivered by Muller subsequent to October 1, 1966. We reverse.
At the outset we note that the parties agree that the trial court properly found that the value of the gas committed by Muller to LIG had increased by October 1966 and a cancellation of the contract redounds to Muller’s financial benefit and to LIG’s detriment.
Muller is the owner, as lessee, of approximately 800 separate mineral leases in the Lawson Field in Acadia Parish. He and several other producers whose gas reserves had not then been committed, were not satisfied with the price offered by the only pipeline then serving that field. LIG owned a pipeline fourteen miles away and became interested in extending its line to purchase gas from the Lawson Field. In order to economically justify the expenditure required to extend its pipeline, LIG required commitments of substantial quantities of gas at a stipulated escalating price schedule. Toward this end the Lawson Agreements were executed by H. L. Hunt on April 29, 1965 and thereafter ratified by Muller and numerous other producers whose Lawson Field gas reserves were not then committed.[1] On July 8, 1965, after the agreement and ratifications had been signed by the producers and returned to LIG, LIG signed the agreement and ratifications.
The Lawson Agreements executed by Hunt on April 29, 1965 provided in part as follows:
Article II. 2.2: Seller shall sell and deliver and Buyer shall take and pay for, . a quantity of gas . . . .’
Article III. 3.1 Point of Delivery: The point of delivery for gas purchased and sold pursuant to this agreement shall be at a mutually agreeable point in the Northeast Quarter of Section 34, Township 9 South, Range 1 East, Acadia Parish, Louisiana.
Article IX. 9.1 Addresses and Notices: Until Buyer is otherwise notified in writing by Seller, notices, statements and payments made to Seller shall be addressed to Seller at the addresses set forth below or at such other addresses as Seller may hereafter designate by notifying Buyer in writing:
H. L. Hunt
1401 Elm Street
Dallas 1, Texas
Until Seller is otherwise notified in writing by Buyer, notices to Buyer shall be addressed to Buyer at the address set forth below or at such other address as Buyer may hereafter designate by notifying Seller in writing ....
The ratification agreement executed by Muller on May 10, 1965 provided in part as follows:
I. Seller agrees to sell and deliver and Buyer agrees to purchase and take gas under the terms, conditions and limitations set forth in the (Lawson Agreements signed by Hunt).
3. In accordance with Paragraph 9.1 of the aforesaid Gas Purchase Contract, *912 Seller hereby appoints and designates H. L. Hunt as Seller’s Representative for the purposes therein stated.
LIG completed the pipeline extension in October, 1965. While this work was progressing, H. L. Hunt and the other producers committed to LIG, installed at their expense a gas collection system hereinafter called the Lawson Gas Collection System, to deliver the committed gas to LIG’s single receiving station. The Lawson Gas Collection System written letter agreement between the producers, Muller included, provided in part as follows:
H. L. Hunt, as Operator and for the joint account of all parties hereto, shall construct and place in operation at the earliest practicable time, a gas collection system consisting of some 5,800 feet of 6JHÍ" line pipe together with necessary valves, fittings and appurtenances at the location indicated . . . . It is desire that H. L. Hunt operate, at joint-cost, said pipeline system for collecting the gas attributable to the interests of the parties hereto which is produced by the wells to be connected. The ownership of the system is based on the net well ownership of the parties hereto which is arrived at by adding the divided and undivided interest of each party in all of the wells to be connected and translating this to percentage of the total number of net wells.
METERING PROCEDURE
Gas shall be measured prior to entering the collection system, and the meter used for this purpose shall hereinafter be referred to as “system inlet meter.” For accounting and settlement purposes, the volumes of gas sold from the purchaser’s meter or meters shall be allocated to the source of origin on the basis that the system inlet meter volume bears to the total inlet meter volume from all sources delivering gas to purchaser through a common sales meter or meters. (Emphasis added.)
Mr. Muller owned 24.7663% of the Lawson Gas Collection System.
We note that the Lawson Agreements and ratifications did not comtemplate well-head purchases by LIG, but on the contrary provided for delivery of commingled gas of committed producers to LIG’s single receiving station. H. L. Hunt was operator of the Lawson Gas Collecting System and under paragraph 9.1 of the Hunt-LIG agreement, Hunt was agent for the Lawson Agreement producers to receive payment from LIG for 100% of all gas delivered to LIG’s receiving station.
In accordance with paragraph 3 of Muller’s ratification agreement which specifically referred to paragraph 9.1 of Hunt’s contract, Hunt received and held as agent for Muller, payments made by LIG for Muller’s proportionate interest in the gas purchased. This method of delivery and payment began in November 1965 and continued through October, 1966. Muller confirmed these arrangements on August 8, 1966 by signing an additional agreement dated July 19, 1966, again appointing H. L. Hunt as agent to receive from LIG, Muller’s share of the commingled stream of gas.
By letter dated October 11, 1966, Mr. James Mary as attorney for Muller, wrote LIG a letter disavowing Muller’s ratification of the gas purchase contract and declared it null and void from the beginning. By letter dated October 11, 1966, Mary as attorney for Muller, notified H. L. Hunt that Muller considered his ratification of the Lawson Agreements null and void ab initio and that Muller was withdrawing from the Lawson Gas Collection System. The letter stated further that Muller’s gas was not being taken by LIG, and sought an accounting and refund for Muller’s share of the Lawson Gas Collection System. By letter dated October 12, 1966, Mary as attorney for Muller, notified LIG that Muller had cancelled his appointment of H. L. Hunt as agent.
*913 LIG answered Muller on October 31, 1966 stating that LIG was unaware of facts or circumstances which would vitiate Muller’s ratification of the Lawson Agreements and asked for clarification. Muller replied with two letters, the first dated November 5, 1966 and the second November 15, 1966, wherein he expanded his contention that the contract with LIG was void ab initio because of error of fact and supplied a form of release (to release Muller from the Lawson Agreements) with a demand that LIG execute the release.
LIG consistently contended that Muller’s ratification of the Lawson Agreements was valid and binding and denied that it had violated the agreement. On December 23, 1966, LIG wrote Muller acknowledging that Muller had revoked his appointment of H. L. Hunt to receive Muller’s share of LIG’s payments. LIG stated its willingness to account directly to Muller for his interest in the gas and stated further that LIG would be “glad to cooperate with Mr. Muller and Mr. Hunt in establishing appropriate procedures for payment.” Muller did not reply to this letter. Muller never informed LIG as to the amount of gas Muller was delivering through the commingled stream presented to LIG’s single receiving station. Instead Muller was contending and his attorney Mary testified after this suit was filed, that Muller’s gas was not being produced and was still in the ground.
On January 9, 1967 H. L. Hunt wrote LIG that although Muller had the right to terminate the appointment of Hunt as agent, he was being asked to reconsider his announced withdrawal from the Lawson Gas Collection System. Hunt pointed out that this would present burdensome and complicated problems if Muller were required to make separate allocations and ac-countings. Muller did not respond to H. L. Hunt’s letter asking him to reconsider.
On February 15, 1967, Mary as attorney for Muller, wrote LIG again demanding that LIG execute the previously preferred release.
On July 13, 1967, H. L. Hunt sent a copy of a letter [2] to Muller and to several producers in the Lawson Field, explaining *914 some of the problems presented by Muller’s allegation that he had no contract with LIG and that his gas was as yet unpro-duced.
On July 17, 1967, Mary as attorney for Muller, wrote LIG that because of Mary’s illness, he desired that further actions on the Muller-LIG matter be held in abeyance. He reiterated that there was no contract existing between LIG and Muller.
On August 21, 1967 and August 24, 1967, LIG wrote Muller’s attorney (Mary) offering to pay directly to Muller the money due for his interest in the commingled gas delivered from October 1966 through June 1967, provided Muller would warrant that he was entitled to receive same. The first letter submitted $38,000 as representing Muller’s share and the second explained the erroneous calculation and submitted *915 that $116,000 was Muller’s share. On September 6, 1967, LIG mailed detailed monthly schedules which it had obtained from H. L. Hunt to indicate Muller’s interest in the commingled stream of gas delivered to LIG.
On September 14, 1967, Mary responded by letter to LIG’s offer of direct payment to Muller. Mary denied the existence of a contract between LIG and Muller, but stated that if there was a contract, LIG had breached it by its failure to pay Muller for his share of the gas. Mary questioned the accounting techniques and figures contained in the recently supplied schedules that LIG had obtained from H. L. Hunt. Mary asked for additional information.
On October 6, 1967, LIG wrote Mary stating that it was attempting to gather the requested information. On October 17, 1967, LIG advised Mary that LIG had employed counsel to represent it in regard to the disputed matter and all further communications should be addressed to LIG’s counsel. LIG’s counsel wrote Muller on October 20, 1967 answering Mary’s questions. LIG reaffirmed its position that the contract was binding and again offered to pay Muller directly for his interest in the commingled stream of gas upon Muller’s warranty of his right to receive the payments under the Lawson Agreements.
On October 30, 1967, Mary as attorney for Muller, wrote LIG’s counsel, stating that Muller’s gas had never been severed from the Lawson Field reservoirs and was never delivered to LIG; that if the contract was valid, LIG had breached it; and that the contract was invalid. In addition, further clarification of the schedules furnished by LIG was requested.
On November 2 and 30, 1967, LIG’s counsel wrote Mary advising that additional time was needed to answer Mary’s questions and that a reply would be forthcoming. On December 18, 1967, LIG’s counsel furnished a detailed reply to each of Mary’s questions.
On January 12, 1968, Mary again denied the existence of a contract between Muller and LIG.
On February 6, 1968, LIG and H. L. Hunt signed an indemnity agreement whereby Hunt agreed to return to LIG the funds which Hunt would have paid to Muller from October 1, 1966 through December 31, 1967, had Muller stayed in the Lawson Gas Collection System. LIG agreed to continue to remit to Hunt monthly payment for 100% of the price of gas delivered to LIG by the Lawson Gas Collection System, and Hunt agreed to return to LIG the amount which Hunt calculated as representing Muller’s proportionate interest. LIG and Hunt agreed that if Muller’s ratification of the Lawson Agreements was in effect and if Muller’s gas had been produced, LIG would pay the money to Muller. On the other hand, if the ratification was invalid or not in effect, then LIG would return the funds to Hunt. This because if Muller’s gas had not been produced, then LIG’s payment to Hunt for 100% of all gas delivered by the Lawson Gas Collection System would be due to those producers whose gas had been produced.
Two days after the indemnity agreement was executed by H. L. Hunt and LIG, LIG filed the suit presently before us, seeking a declaratory judgment recognizing the existence of the LIG-Muller gas purchase contract, and a declaration of the rights, obligations and status of the parties. According to H. L. Hunt’s figures which were adopted by LIG, $192,433.90 had accumulated for Muller’s account for the period October 1966 through December 1967 and that amount (which had been delivered by Hunt to LIG just two days before) was deposited in the registry of court.
The trial court held that Muller’s ratification of the Lawson Agreement was valid and that LIG complied with its contract obligations through October 1, 1966. The trial court dissolved the contract effective October 1, 1966 finding that LIG had not *916 complied with the contract in that it failed to pay Muller for his share of the gas for an excessive period of time.
The trial judge limited consideration of Muller’s October 1966 through February 1968 contention (that all of Muller’s gas remained in the ground and was not being and had not been delivered to LIG) to the following statements in his opinion. “There was a contention made at one time (by Muller) that (Muller’s) gas remained in the ground and that (the other owners in the commingled stream of gas) were delivering their gas and not (Muller’s). (Muller) in his testimony stated that his gas also was being delivered so therefore, this contention or this alleged contention of (Muller) must fail.” Muller’s brief to this court does not offer additional support for the trial court’s disregard of the established fact that Muller contended from October 1966 until after this suit was filed that his gas was not being produced. The fact that Muller testified in September, 1970 that he had since learned that his gas was being produced, did not erase the effect of his prior inconsistent declarations. LIG could not be required to pay Muller for gas which Muller steadfastly maintained he was not delivering to LIG.
The trial judge dismissed LIG’s contention that LIG could not determine what amount of gas Muller was delivering (if indeed the Lawson Gas Collection System was delivering some of Muller’s gas), and also dismissed the fact that Muller never attempted to state how much gas he was delivering to LIG, with the following statements.
“It was apparent, however, that (LIG), had no difficulty in making payments when H. L. Hunt acted as agent as to the amounts, etc. The suit . . . was filed on February 8, 1968. (At that time, LIG tendered to Muller) the sum of $192,433.90 which it contends was the amount due (Muller) from October, 1966 through December of 1967. It is thus apparent that (LIG) made no payment whatsoever to (Muller) from October, 1966 until the alleged tender was made with the filing of the suit in February of 1968.
“The question is presented as to whether or not (LIG) was entitled to wait this long because of (Muller’s) statement that the contract was cancelled.
“Once the agency contract was cancelled, of course, both (LIG and Muller) were hound by the agreement between the parties which called for a monthly payment and which also called for payment of six percent (6%) interest. It was admitted by (LIG) that in the amount tendered the six percent (6%) interest called by the contract was not paid.
“The court realizes that parties should have an opportunity to negotiate their differences that the law favors amicable settlement. Obviously there was an attempt by the parties to do this as indicated by the correspondence between them prior to the institution of this suit.
“This court, however, feels that a period in excess of a year wherein negotiations took place between the parties is excessive and for that reason feels that (LIG) has not complied with the contract and therefore, the contract should be cancelled as of October, 1966.”
LIG appealed suspensively contending among numerous other assigned errors, that the contract is valid because Muller cannot benefit from his erroneous declaration that the contract was null and void from the beginning. Muller answered the appeal seeking a cancellation of his ratification retroactive to the day it was signed, May 10, 1965. Muller contends that LIG was required to pay Muller directly for Muller’s share of the gas, and that LIG’s payments to H. L. Hunt (from November 1965 through the September 1970 trial) for 100% of the commingled gas delivered, did not discharge LIG’s obligations to Muller.
With the exception of Muller’s claim that he had not been paid for his gas, *917 Muller made no effort to sustain the numerous allegations of “error” and additional contentions cited in Mary’s October 11 and 12, 1966 letters and the follow up letters, as reasons to support Muller’s declaration that his ratification of the Lawson Agreement was void ab initio. LIG timely paid H. L. Hunt for 100% of the gas delivered to LIG from the November 1965 first delivery through the September 1970 trial.
The trial court correctly determined that prior to October, 1966 all payments to Muller were properly paid to H. L. Hunt as Muller’s agent. Paragraph 3 of Muller’s May 10, 1965 ratification refers to and approves the authorization of Hunt as “Seller’s Representative” which was provided for in Section 9.1 of the Hunt-LIG Gas Purchase Contract. A reading of the entire Gas Purchase Contract together with the ratifications of some ten producers disclosed that LIG was obligated to pay one party for 100% of all commingled gas delivered to LIG’s single receiving station.
Further evidence of the parties intent that H. L. Hunt act as Muller’s agent for purposes of receiving his share of payments for the gas, is found in the manner in which the parties interpreted the agreement. LSA-C.C. Art. 1956; Pendleton v. McFarlane, 222 La. 569, 63 So.2d 1 (1953). Muller, H. L. Hunt and the other producers undertook at their expense to construct the Lawson Gas Collection System and appointed H. L. Hunt to operate the system. LIG did not undertake to compute the producers ownership interests in the delivered commingled stream of gas. LIG did not buy gas at the producer’s well head. It bought gas delivered in a commingled stream to its single receiving station. Hunt acted as Muller’s agent in fact: he received and held for Muller the share of payments attributable to Muller’s interest. Muller, moreover acquiesced in Hunt’s actions. The payments held by Hunt were claimed by Muller to offset debts Muller owed to Hunt. Muller introduced no evidence to indicate that the contemplated scheme of payment was other than that described in the uncontradicted testimony of LIG’s vice president, Mr. Ward, to the effect that LIG was to pay Hunt as agent for all producers who were parties to the Lawson Agreements.
On August 8, 1966, Muller confirmed this arrangement by signing an express agency agreement (hereinabove referred to as an agreement dated July 19, 1966) appointing H. L. Hunt as his representative to receive and disburse payments from LIG. The trial court correctly held that the accounting problem with regard to production until October 1966 did not involve LIG. There is no merit to Muller’s answer to this appeal in which he seeks to cancel Muller’s ratification because LIG did not pay Muller directly for gas produced from November 1965 through September 1966.
On appeal Muller has abandoned his contentions that his agreement was void ab initio because of error of fact and that Muller’s gas was unproduced — contentions steadfastly maintained until the trial. Instead Muller contends only that LIG failed to meet its contract obligation to timely pay for gas delivered by Muller. We find manifest error in the trial court’s acceptance of that argument because from October 1966 until trial, Muller uniformly repudiated his contract and contended that his gas was not being produced. In September of 1967 he first advanced his alternative contention that if his gas was being produced, LIG failed to timely pay for the gas. Tt is difficult to comprehend how Muller can reconcile his mutually exclusive postures: on the one hand he denies validity of his contract and that his gas is being produced, but on the other hand he demands payment for the gas.
We consider that failure to pay is an issue only from the time Muller repudiated his contract and rescinded Hunt’s agency authority; theretofore payments were *918 made in accordance with the previously discussed agreement.
The repudiation of the contract, the rescission of Hunt’s agency, and the contention that Muller’s gas was unproduced created grave problems between LIG and Hunt in addition to the obvious problem created between LIG and Muller. An overview of the problems shows they grew out of unexpected changes in accounting and gas allocation procedures necessitated by Muller’s unforeseen and unjustified actions and contentions. Pretermitting the problem of how LIG can be required to pay for gas which its vendor denies he is selling, there are other reasons which prevented LIG from paying Muller. Did the contract provide that LIG had the obligation to determine how much gas Muller was delivering? How could LIG determine how much gas was being delivered for Muller’s account?
We find that separate and individual payment to each producer party to the Lawson Agreements with LIG, was not contemplated by the parties. Rather, the understanding was that payment for 100% of the gas purchased would be made to H. L. Hunt who in turn would disburse to each producer his or its share as determined by interest schedules computed and frequently revised by H. L. Hunt. LIG’s obligation was to pay for 100% of the gas which passed through its one measuring meter located at its single receiving station. LIG met this obligation by paying Hunt for 100% of the gas delivered each month on or before the 25th of the following month. Interest did not become due under paragraph 3.3 of the General Terms Agreement because all payments were made before the due date.
The obligations of gathering the gas, determining the proportionate interests of the producers, paying each producer the amount due, and maintaining accounting schedules were undertaken by the producers. H. L. Hunt undertook this responsibility in the express agency agreements and the Lawson Gas Collection System agreement.
After October, 1966 when Muller took the position that his gas was as yet unpro-duced, H. L. Hunt held in suspense the share of payments attributable to Muller’s interest. It was Hunt’s position (and continued to be his position until an indemnification agreement between H. L. Hunt and LIG was signed in February, 1968) that if the gas apportioned to Muller and sold to LIG was not Muller’s, as indeed Muller then claimed, then it belonged to Hunt and the other Lawson Field producers. During the period from October, 1966 through February, 1968, Hunt would not, therefore, rebate to LIG for direct payment to Muller any portion of monies paid by LIG for gas.
LIG contends that the period of time during which payments were suspended was not too long, as was held by the trial court, but was fully required in order for LIG to secure both information necessary for it to make payments directly to Muller and an agreement whereby Hunt would return to LIG, Muller’s share of gas payments. Further, LIG contends the period of delay was justified because it was the consequence of Muller’s repudiation of his contract with LIG, which repudiation was unjustified and had the effect of a prior breach. LIG reasons that this prior breach of contract relieved it of the obligation to make further payments until Muller acknowledged that the contract was in effect.
We agree with LIG’s contention that ap-pellee’s repudiation of the contract effectively prevented direct payment as long as Muller denied the validity of the contract. Muller may not prevent payment by denying the legal existence of the contract thereby creating substantial impediments to performance, and thereafter avail himself of the non-performance occasioned by his denial as sufficient cause for cancellation. Cox v. Department of Highways, 252 La. 22, 209 So.2d 9 (1968).
*919 The October 1966 alleged non-existence of the contract by Muller, his insistence that it was “void ab initio”, his insistence that he was not performing his contract by making deliveries, his instructions to LIG to strike the contract from its file and not to send him further data or information, placed Muller in default and precluded him from claiming subsequent nonperformance by LIG as a reason or cause for forfeiture. Leonard v. Busch-Everett Co., 139 La. 1099, 72 So. 749 (1916); Sitman v. Burton & Lindsey, 123 La. 53, 48 So. 646 (1909); Lieber v. Ouachita Natural Gas & Oil Co., 153 La. 160, 95 So. 538 (1922).
Muller cannot avoid the burden of a contract when his own conduct prevented LIG from carrying out its part of the undertaking when LIG was ready and willing to discharge its obligation. Frank T. Payne v. Lyons Cypress Lumber Co., 7 Orl.App. 325, Case No. 4971.
We hold further that the period of time during which payment was delayed was not excessive, but was justified because of the mitigating factors involved. LIG never refused to pay Muller. On the contrary, LIG offered to pay Muller directly if he would but acknowledge that his contract was valid. These offers were made before the indemnification agreement was entered into by LIG and Hunt, and would therefore, if accepted by Muller, have constituted double payment for Muller’s gas. The record indicates, moreover, that from October, 1966 until suit was filed in February, 1968, LIG attempted to resolve the problems involved in direct payment and accounting to Muller. Without cooperation from Muller, (and using Hunt’s calculations as to Muller’s interest, the accuracy of which LIG had no ability or obligation to check), LIG arranged the indemnification agreement with Hunt which allowed for LIG’s deposit of funds into the registry of court when suit was filed. Muller’s actions and contentions illustrate how one-sided was the attempt to amicably settle the problem. Muller refused to warrant that his gas was being produced. Muller is contending at this time that the contract should be set aside as of the day Muller executed the ratification agreement.
Muller refused all payments tendered on the condition that he acknowledge the validity of his contract with LIG. Muller has never submitted a statement certifying how much gas he delivered as his part of the commingled stream of gas delivered each month by the Lawson Gas Collection System.[3] Muller made no attempt to construct his own delivery system. There was no showing that LIG had either the right or the obligation to determine the varying *920 amounts of production from the numerous wells in the numerous units.
Muller’s argument that he was not required by the terms of the contract to cooperate in furnishing information or to warrant his right to receive payment as a condition to LIG’s tender of payment, ignores the fact that the initial contemplation of the parties did not include direct payment. Muller had the obligation under the agreement (which agreement he continues to repudiate) of delivering his gas to LIG.
The Lawson Agreement provided that “ . . . Seller shall sell and deliver and Buyer shall take and pay for ... a quantity of gas . . . ” Muller, as seller, had the obligation to deliver his gas to LIG’s receiving station at the Lawson Field.
The seller is bound to two principal obligations, that of delivery and that of warranty of the thing which he sells. LSA-C.C. Art. 2475. By withdrawing from the Lawson Gas Collection System and notifying LIG that his gas was not being and had not been produced, Muller violated his first obligation as seller. If Muller’s gas was being delivered by the Lawson Gas Collection System (from which Muller withdrew), it was being delivered in a commingled stream and Muller had the obligation of certifying how much of the commingled stream belonged to him. By refusing to inform LIG how much of the commingled stream of gas delivered each month was Muller’s, Muller violated his second obligation, that of warranty of the thing which he sells. He was also obliged to warrant that his claim for gas did not impinge on the share belonging to the remaining producers who sold gas through the commingled stream delivered by the Lawson Gas Collection System. Muller’s refusal to admit that his gas was being delivered, his refusal to state how much of the commingled stream was his, his refusal to join with LIG and Hunt in an effort to find a procedure to make this determination, combined to relieve LIG from making separate payments to Muller. It also relieves LIG from paying 6% interest on Muller’s accumulated payments.
The trial court’s holding that the contract should be cancelled because appellant failed to make payment for an excessive period of time is based on a faulty finding of fact and a disregard of the effects of Muller’s actions. The trial court observed that LIG’s claims of inability to pay because of insufficient information in regard to Muller’s interest and because of Muller’s repudiation of their contract, apparently presented no difficulty to LIG when it was making payments to Hunt as Muller’s agent. This finding, the basis for the cancellation, does not reflect the evidence to the effect that payments to Hunt were for 100% of the gas passing through LIG’s meter. Information pertaining to individual producer interests was maintained by Hunt. The finding also pretermits the problem of double payment for Muller’s gas.
Because the intent of the parties in regard to specific obligations under the contract has been obfuscated by Muller’s actions, LSA-C.C. Arts. 1963, 1964, and 1965 dictate that we interpret the contract terms as the parties may reasonably supposed to have intended, according to the “principle not to do unto others that which we would not wish others should do unto us, and on the moral maxim of the law that no one ought to enrich himself at the expense of another.”
The judgment of the trial court annulling the contract is reversed. It is ordered, adjudged and decreed that there be judgment in favor of Louisiana Intrastate Gas Corporation and against F. J. Muller recognizing that F. J. Muller’s ratification of the Lawson Agreements is in full force and effect. It is further ordered, adjudged and decreed that the First National Bank *921 of Crowley, Crowley, Louisiana, deliver to Louisiana Intrastate Gas Corporation all funds held by it in escrow.
It is further ordered, adjudged and decreed that Louisiana Intrastate Gas Corporation is to continue to pay H. L. Hunt Individually and as agent, for 100% of the gas delivered to LIG’s receiving station. The portion attributable to Muller’s interest in the gas (as computed by Hunt) is to be remitted to LIG in accordance with the terms of the LIG-Hunt Indemnification Agreement. These current funds as well as the accumulated funds heretofore held in escrow are to be held by LIG for Muller’s account until such time as F. J. Muller can present monthly statements showing precisely the amount of gas he has delivered to LIG. When Muller presents statements which have been approved by all producers (or their agent or agents) participating in the Lawson Gas Collection System, LIG is to immediately pay Muller for all gas which has been delivered to LIG for Muller’s account. Payments for these accumulations to Muller’s account are to be interest free.
Thereafter, Muller is to present monthly statements certifying the amount of gas he has delivered in the commingled stream, which statements shall be approved by all producers (or their agent or agents) participating in the Lawson Gas Collection System. The delays provided in paragraph 3 of the General Terms and Conditions contract (requiring Buyer to pay Seller 6% per annum interest on late payments) begin to run when Muller presents approved monthly statements certifying the amount of gas he has delivered in the commingled stream.
All costs of court both at trial and on appeal are assessed to defendant F. J. Muller.
Reversed and rendered.
Frugé, J., dissents.

. The gas purchase agreement between H. L. Hunt and LIG was ratified by General American Oil Company of Texas, Pan American Petroleum Corporation, Bradco Oil & Gas Co., Cotton Brothers Baking Company, Inc., Horace Moneeaux, Paul M. Toce, F. J. Muller and others (all producers in the Lawson Field). All of these producers are bound by identical agreements. Excepting Muller, none of the producers have complained about their contracts, the remuneration received by them thereunder, or the performance by LIG of its obligations.

. H. L. HUNT
1401 Elm Street
Dallas, Texas 75202
July 13, 1967
Columbian Fuel Corporation
401 Dewey Avenue
Bartlesville, Oklahoma
Attention: Mr. W. F. Hanagan
RE: Gas Balancing Agreement
Lawson Field
Acadia Parish, Louisiana
Gentlemen:
This will acknowledge receipt of your letter of July, 11, 1967, to the attention of our W. E. Vaughn, concerning the lack of a balancing-agreement between us and questioning the status of gas volumes which are attributable to the Muller interest in our group. Mr. Vaughn has asked the writer to reply.
For your information, we are enclosing copies of the following:
(1) “Ratification of Gas Purchase Contract and Liquefiable Hydrocarbon. Purchase Agreement”, dated May 10, 1965, executed by F. J. Muller and Louisiana Intrastate Gas Corporation.
(2) Lawson Gas Collection System Agreement, dated June 2, 1966, executed by H. L. Hunt, Pan American Petroleum Corporation, Bradco Oil & Gas Co. and F. J. Muller.
Upon the basis of the above contracts, and miscellaneous correspondence, at the time we commenced to take in kind the Hunt, et al, share of gas produced from the Lawson Field units which you operate, there was no question in our mind *914 but that Mr. Muller’s share of gas was being taken for delivery and sale to Louisiana Intrastate. Since that time, however, like you we have been advised that Mr. Muller considers his ratification invalid, that he has no contract for the sale of his share of Lawson Meld gas production, and that the production which we are taking through our gathering system does not include his interest. On the other hand, we have been advised by Louisiana Intrastate that they disagree with Mr. Muller, consider his ratification to be valid and that his share of Lawson Field gas production is committed under the purchase contracts in question.
We wish to note that we have continued to receive payment from Louisiana Intrastate for Mr. Muller’s share of gas which has been delivered to them. Due to Mr. Muller’s position, however, we have held these proceeds in suspense pending settlement of his dispute with Louisiana Intrastate, since it follows that if Mr. Muller’s share of gas is not being sold to our purchaser, then such proceeds are not his. Also, as you have pointed out in your letter, if this is the case, then to the extent that the remaining parties to our Lawson Gas Collection System Agreement have taken in kind the volume of gas attributable to Mr. Muller’s interest in these units, we are over produced to such extent.
We were recently contacted by, James R. Mary, on behalf of Mr. Muller, who inquired as to why Mr. Muller has not received from us payment for his share of Lawson Field gas production. We advised Mr. Mary along the lines indicated above; and further asked that if Mr. Muller now considered himself to have a valid contract with Louisiana Intrastate to so advise them and us, so that proceeds attributable to his interest might be placed in line for payment. As of this date we have not received a reply.
We feel, and assume that you agree, that we cannot proceed to enter into a gas balancing agreement with you to cover the Hunt, et al, interests until we have some form of final determination as to whether Mr. Muller’s interest is or is not to be included. Although this is not a problem of our making, or yours, we wish most earnestly to urge Mr. Muller and Louisiana Intrastate to attempt to reach some form of a final determination. Until they do so, the dispute between them will continue not only to cloud their own affairs but also those of other parties.
Very truly yours,
H. L. HUNT
It. E. Johnson
REJ :mc
cc: Pan American Petroleum Corporation P. O. Box 266 New Orleans, Louisiana Attention; Mr. E. A. Renfro
General American Oil Company of Texas 5646 Milton Street Dallas, Texas Attention; Mr. Donald C. Apeland
Mr. Paul M. Toce P. O. Box 52401 Lafayette, Louisiana
Mr. F. J. Muller P. O. Box 423 Crowley, Louisiana
Louisiana Intrastate Gas Corp. P. O. Box 111 Alexandria, Louisiana Attention: Mr. Ward T. Jones
Mr. W. E. Vaughn

. The Lawson Field is made up of some 5,300 acres and includes many city lots located in Crowley. Gas and gas condensate is produced from five separate reservoirs produced from 21 separate wells, some of which are dually and triply completed. The entire field has been unitized into numerous separate production units by orders of the Louisiana Department of Conservation, which units have been revised on several occasions. Each time a unit is revised, the ownership percentage changes for each tract included in each of the seven different units in which Muller has an interest.
Mueller did not participate in the risk and cost of drilling the producing wells. His leases are productive because of unitization orders of the Louisiana Department of Conservation which formed production units for the producing wells. When Muller’s tracts were included in the producing units, he did not pay for his share of drilling and operating costs. Instead, Muller told the various operators (those who drilled and produced the wells) to take his costs “out of production.” At the 1970 trial, Muller did not know which of the various producing wells had paid out, and which had not.
The percentages of ownership in the commingled stream of gas were constantly changing by virtue of the fact that (1) the geographic limits of the units were changed by the Conservation Department, (2) the wells produced varying amounts depending on the changing allowable and the changing ability of each well to produce, and (3) the update of title information (concerning the thousands of leases in the field) changed the percentages of ownership of each producer.