290 So.2d 888 (1974)
LOUISIANA INTRASTATE GAS CORPORATION
v.
F. J. MULLER.
No. 53582.
Supreme Court of Louisiana.
February 18, 1974.
Rehearing Denied March 22, 1974.
*889 J. J. Davidson, Jr., Lawrence E. Donohoe, Jr., Lafayette, Edward M. Doyle, Alexandria, Davidson, Meaux, Onebane, Donohoe, Bernard, Torian & Diaz, Lafayette, for plaintiff-respondent.
Nolan J. Edwards, Edwards, Stefanski & Barousse, Crowley, for defendant-applicant.
SUMMERS, Justice.
This suit was instituted on February 8, 1968 by Louisiana Intrastate Gas Corporation (LIG) against F. J. Muller for a declaration of the validity of a certain Ratification of Gas Purchase Contract and Liquified Hydrocarbon Purchase Agreement dated May 10, 1965, and for a determination of the rights and obligations between the parties. The contract Muller ratified on May 10, 1965, was executed by LIG, as buyer, and H. L. Hunt, as seller, and is known as the Lawson Agreement. It affects gas and liquified hydrocarbon production owned by Muller and others in the Lawson Field of Acadia Parish.
LIG deposited $192,433.90 into the registry of the court representing funds it calculated *890 to be then due Muller under the Lawson Agreement. Since that time it has made periodic deposits representing its calculation of funds due for Muller's gas received into its pipelines. These funds were by agreement placed in escrow in a Crowley bank pending outcome of this litigation.
The trial court rendered judgment cancelling the contract effective October 11, 1966, ordering the funds in escrow delivered to LIG and reserving to Muller the right to an accounting against LIG. The reason assigned for the cancellation of the contract was that LIG had too long delayed payments to Muller for his gas it received into its line. The Court of Appeal reversed, found the Lawson Agreement to be in full force, and ordered the funds in escrow delivered to LIG. It then directed the method of settlement to be followed between LIG and Muller. La.App., 275 So.2d 909. Certiorari was granted on Muller's application. 279 So.2d 683.
The Hayes sands and the Marg-Tex Reservoirs of the Lawson Field of Acadia Parish underlie approximately 5,380 acres in and around the city of Crowley. Muller is the owner, as lessee, of approximately 800 leases representing fractional interests in various units producing from the same reservoir in the field. Hunt Oil Co., Atlantic, General American, Michigan-Wisconsin, Cities Service and a number of other oil and gas companies are producers and operators within the field.
Cities Service was a producer in the field delivering its gas in the only pipeline servicing the field to its subsidiary Columbian Fuel Corp. The substantial production by Cities Service from the common reservoir resulted in substantial drainage to Muller and other lease owners. Because a number of lease and mineral owners were not then marketing their gas, LIG commenced negotiating with them in 1964 for the purchase of gas and liquid hydrocarbons. To justify the substantial investment required to construct a pipeline from the Lawson Field to its system 14 miles away, LIG sought commitments from the producers in the field owning a sufficient interest in the gas reserve to warrant the expenditure.
Accordingly, on May 10, 1965, LIG and Muller entered into a Ratification of Gas Purchase Contract and Liquified Hydrocarbon Purchase Agreement, whereby he ratified the Lawson Agreementthe contract in contest here. The Lawson Agreement which Muller ratified became effective July 8, 1965. It was signed by H. L. Hunt (Hunt), as seller, and LIG, as purchaser, and provided for the sale at stipulated prices of all gas belonging to Hunt, and the parties who ratified the Lawson Agreement, produced from a specified area of the field. The identical contract was also ratified by General American Oil Company of Texas, Pan American Petroleum Corporation, Bradco Oil Co., Cotton Brothers Baking Company, Inc., Horace Monceaux, Paul M. Toce and others (all producers in the Lawson Field), who were made parties to this suit.
LIG then purchased the necessary rights of way, constructed the line to the agreed point of delivery in the Lawson Field and began purchasing gas attributable to the signatories of the Lawson Agreement in November 1965 with respect to the one well operated by Hunt. In June 1966 purchases were begun from the seven wells operated by Cities Service. The purchases being accomplished through gathering and delivery facilities owned in common by several producers but operated by Hunt.
In August 1966 Muller approved the appointment of Hunt as operator to serve as his representative together with the other signatories to the Lawson Agreement for disbursing all proceeds from the sale of gas produced and/or processed under the Lawson Agreement plan. By the terms of this agreement Hunt was made responsible for royalty settlements, severance tax payments and working interest settlements to joint interest partners, and for preparing monthly allocation statements setting forth *891 the volumes of gas delivered to LIG for the account of each party seller, and to otherwise represent the sellers in the Lawson Agreement. When signing the foregoing, however, Muller fixed the duration of his participation by inserting the clause "until further notice", meaning the appointment of Hunt as his agent was revocable upon notice by him.
In accordance with accepted practice, it was understood that Hunt would retain 8/8ths of the proceeds from Muller's working interest until his share of the cost of drilling the wells operated by Hunt was satisfied and, in addition, Hunt would retain Muller's proportionate share of the cost of operating the producing wells in which he had an interest and his proportionate share of the cost of constructing and operating the gathering system. Muller's interest in the collection system was 24.7663%.
LIG made payments to Hunt as agent for the parties to the Lawson Agreement, remitting 100% of the contract price of the products received to be allocated and remitted in turn to the parties in interest.
On October 4, 1966 LIG wrote to Hunt, with copies to Muller and the other parties to the Lawson Agreement, concerning low temperature recovery units in use on the wells operated by Cities Service suggesting an adjustment basis to comply with provisions of the Lawson Agreement. Then, on October 11, 1966, Muller acknowledged receipt of the copy of LIG's letter of October 4. In addition, Muller's letter made reference to a letter purportedly written by him to W. T. Jones, LIG's president, in which he informed Jones that the Lawson Agreement was null and void "due to having procured my (his) signature through, what is known as `Error of Fact'." The letter of October 11 further advised that Muller's gas was not committed and there was no need for LIG to continue furnishing information to Muller as he had no contract with LIG.
It was never proven at the trial that the letter to LIG's president W. T. Jones had in fact been sent or received. The "error of fact" referred to in the October 11 letter, advanced as a basis for the nullity of the Lawson Agreement, was later revealed to be based upon Muller's discovery that he ratified the Lawson Agreement on May 10, 1965, whereas the Lawson Agreement was not dated until July 8, 1965. This apparent inconsistency was explained at the trial to be due to the fact that a number of parties were involved and time was required to obtain their signatures. As the signatures were obtained, each ratification was dated. When all signatures were obtained, "July 8, 1965" was inserted as the effective date of the Lawson Agreement. Copies were then sent to Muller and the other signatories.
On October 12, 1966, Muller again wrote to LIG, this time availing himself of the "until further notice" clause which he had inserted in the agency agreement to limit its duration. He advised that he was terminating the appointment of Hunt as his agent to sell his gas under the terms of the Lawson Agreement. He also enclosed a copy of the letter referred to in his letter of October 11, purportedly written by his attorney James R. Mary to the attention of LIG's president, dated July 9, 1966, in which the Lawson Agreement was declared to be invalid. The authenticity of this letter is called into question by the fact that one month after it was purportedly written Muller appointed Hunt as his agent on August 8, 1966 to receive payments from LIG. The letter of October 12 again restated Muller's contention that the Lawson Agreement was executed by him "through the mistaken belief of Error of Fact."
LIG replied on October 31, 1966 that they were unaware of any facts or circumstances which would impair the validity of their contract with Muller and requested advice as to the basis of his contention. Muller's attorney, Mary, answered on November 5, 1966, explaining the fact that the *892 ratification was dated prior to the date of the Lawson Agreement it purported to ratify. He enclosed an instrument titled "Release" for execution by LIG which would cancel Muller's obligations under the Lawson Agreement. Again on November 15, 1966 Mary wrote LIG's president W. T. Jones referring to the Lawson Agreement as "void ab initio". He furnished a legal memorandum purporting to support his argument that the Lawson Agreement was an absolute nullity.
LIG again wrote to Mary on December 13, 1966 referring to Muller's termination of the appointment of Hunt as agent to sell his gas to LIG. A copy of the letter was sent to Hunt requesting that he advise LIG of his position relative to the termination. In closing LIG wrote:
"Louisiana Intrastate Gas Corporation is willing to account direct to Mr. Muller for his interest in the gas and gas liquids delivered and attributable to his interest in such production from the effective date of termination of such representation and shall be glad to cooperate with Mr. Muller and Mr. Hunt in establishing appropriate procedure for payment."
No reply by Muller to this offer was received by LIG. Hunt acknowledged LIG's letter on January 9, 1967, and expressed its understanding of the situation to be that by terminating Hunt as seller's representative in connection with the Lawson Agreement, Muller wished to continue utilizing the gathering system but desired a direct accounting from LIG. At the same time Hunt expressed its concern that the termination would further complicate accounting procedure necessary to ascertain and allocate the various interests. A copy of the above letter was sent to Muller requesting that he reconsider his position in this matter.
Thereafter on February 15, 1967 Muller's attorney again wrote to LIG demanding cancellation of the Lawson Agreement by February 22, and claiming that LIG would be liable for all damages suffered by
Muller as a result of LIG's insistence upon the validity of its contract with Muller.
In the meantime Hunt continued to receive all payments from LIG including that for Muller's interest in the gas gathered by Hunt and delivered to LIG. These funds were placed in a suspense account pending settlement of the dispute. During this period, also, Hunt's representative advanced the theory that if Muller had no contract with LIG and his gas was not being sold, then the funds being received by Hunt from LIG belonged to the remaining parties to the Lawson Agreement.
Although willing at all times to make payment directly to Muller, LIG was not furnished by Muller with the information necessary to calculate his interest in the gas it was receiving from Hunt. And, since Hunt was no longer acting for Muller, the obvious perplexing question was whether Muller's gas was indeed being delivered. The question being how could it be otherwise than commingled in the gathering system in the absence of a showing that Muller's gas was separated at some point from the commingled mass.
In a letter addressed to Muller's attorney on August 21, 1967 LIG reiterated its position that the Lawson Agreement was binding upon Muller and remained in full force and effect. It again acknowledged the revocation of the Hunt agency appointment by Muller and pointed out that Muller had taken no steps to assist LIG in determining how the calculation of his interest should be made subsequent to the revocation of the Hunt agency. LIG further informed Mary that Hunt had allowed access to its records
"only with the understanding that no warranty or representation of any kind is made with respect thereto by H. L. Hunt, and specifically reserving unto H. L. Hunt, et al the right to claim all proceeds in their possession otherwise attributable to the interest of F. J. Muller if Mr. Muller's contract is void ab initio as you contend."
*893 LIG then referred to an enclosed summary of its calculations of Muller's interest accrued during the period from October 1966 through June 1967 (the amount was later corrected due to an erroneous calculation.) LIG then stated that if Muller would accept payment and warrant his right to receive it under the Lawson Agreement, it would take all appropriate steps to make direct payments to Muller for the duration of the Lawson Agreement.
Mary replied on September 14, 1967 disputing the correctness of some aspects of the schedules and restating his demand for the cancellation of the Lawson Agreement. He enclosed a copy of a suit for declaratory judgment to judicially ascertain the validity of the Lawson Agreement which he advised he would file on October 6, 1967 unless LIG agreed to the cancellation of the contract.
It was then that LIG negotiated an "Indemnity Agreement" dated January 31, 1968, accepted by Hunt on February 6, 1968. Thereby LIG was permitted to pay Hunt for the gas which the parties considered attributable to Muller's interests under the Lawson Agreement, the payments to be made under the same procedure previously established when Hunt was authorized to act as Muller's agent. By this agreement LIG would not be called upon to make double payments in the event the sums were determined not to belong to Muller. Hunt executed this agreement with the understanding that if the gas did not belong to Muller, it belonged to the parties to the Lawson Agreement. It was under this same agreement that LIG was permitted to withdraw the funds in the suspense account and deposit them in the registry of court.
With affairs in this status, LIG filed the declaratory judgment action on February 8, 1968 and deposited the sums it calculated to be due to Muller into the registry of court. It was at this time that Muller and LIG entered into a joint motion, which the court approved, to withdraw the funds from the registry of the court and to deposit the amounts at interest in a local bank. The joint motion provided in pertinent part:
If there be final judgment decreeing that the said Ratification of Gas Purchase Contract and Liquified Hydrocarbon Purchase Agreement dated the 10th day of May, 1965 (hereinafter referred to as the Lawson Agreement) is valid, and that Defendant's gas in Lawson Field has been produced and sold to Plaintiff, the sums deposited pursuant to this judgment shall be the property of F. J. Muller. In such event the interest earned on the deposited sums shall be the property of Plaintiff; provided, however, that if by such final judgment Defendant is found to be entitled to any sums of money as interest because payments due Defendant are past due and unexcused under the Lawson Agreement, then the interest earned on the deposited sums shall be the property of Defendant, to be applied, however, as a credit toward the payment and liquidation of any sums due Defendant by Plaintiff as interest under the Lawson Agreement.
The principal contention advanced by Muller for claiming the invalidity of the Lawson Agreement is no longer urged. As we have noted in the narration of facts, the contention that Muller ratified the Lawson Agreement on May 10, 1965, prior to its effective date on July 8, 1965, was explained by the time lapse required to obtain the signatures of the various parties to the agreement. These signatures constituted the commitment of enough producers to warrant construction of the gas line contemplated by the Lawson Agreement. Moreover, after July 8, 1965, in August 1966, Muller approved the appointment of Hunt as operator to serve the sellers under the Lawson Agreement. This was, in effect, another ratification of the Lawson Agreement, an additional factor adversely affecting Muller's contention that he was not bound by the Lawson Agreement.
*894 Another position Muller took at the trial was that he was unaware of the fact that the Lawson Agreement included his entire interest in the Lawson Field, it being his understanding at the time of signing that only ten percent of his interest would be affected. But this position was rejected at the trial and in the Court of Appeal as unacceptable. Muller's knowledge and experience in this phase of the oil business was considered too extensive to justify such an alleged oversight. We agree.
Muller's sole remaining contention is that the Lawson Agreement is invalid because LIG breached the contract by failing to promptly pay Muller for gas under the terms and conditions of the Lawson Agreement.
This position is irreconcilable with Muller's position prior to the institution of this suit. At all times until trial and, in truth, during the trial, Muller contended that he had no contract to sell his gas to LIG. His position now is that LIG breached its contract with him by not paying for the gas.
In our view LIG did not breach the Lawson Agreement with Muller. After confection of the contract, LIG made payments to Hunt, Muller's agent under a valid and subsisting appointment. When notice was received from Muller in October 1966 that he considered the contract null and void, LIG steadfastly insisted that the contract was valid and continued to receive and pay for gas from Hunt. The funds calculated to belong to Muller were placed in a suspense account awaiting settlement of the dispute thus presented. During this time Muller neither demanded nor agreed to accept payments from LIG.
As these facts developed Hunt and the other parties took the position that if Muller was not a party to the Lawson Agreement, and if his gas was not being delivered as he contended, the gas gathered and delivered to LIG belonged to the remaining parties to the Lawson Agreement and they were entitled to the full proceeds from its sale. This placed LIG in the position whereby if payment was made to Muller before his contention was settled, and it was later determined that his gas was not delivered to LIG, as Muller insisted, then LIG would also be responsible to Hunt and the others for the sums paid Muller. LIG would thus be subjected to double payment.
Despite this dilemma, LIG must have concluded that Muller's gas was being delivered, but it could not be certain about this or, if the gas was being delivered, what quantity Muller was entitled to. Therefore, basing its calculations upon the information obtained from Hunt, which was not warranted to be correct, LIG offered to pay Muller if he would acknowledge that the payments were received pursuant to the Lawson Agreement. This Muller refused to do. We cannot conclude under these circumstances that LIG violated its obligation to pay Muller for his gas under the terms of the Lawson Agreement when Muller was contending that no such agreement existed and when he refused to agree to the quantity of gas LIG was receiving.
In our opinion the law will not support a finding that the contract has been breached by LIG while Muller was continually repudiating that contract and contending that it was void ab initio. It was at all times Muller's principal contention that there was no contract. The letters he wrote were concerned with the invalidity of the contract for error of fact in its inception. It was not his contention that he should be paid during the interval of time (October 1966 to February 1968) wherein he now asserts LIG breached its contract by not making prompt payments. To the contrary, when LIG offered payment it was refused.
The condition of the Lawson Agreement was that the seller (Muller) must deliver the gas to LIG's line. Muller authorized Hunt to act as his agent in this respect. He then terminated this agency and denied that a contract to sell existed. Cox v. Department of Highways, 252 La. 22, 209 *895 So.2d 9 (1968); Garig Transfer v. Harris, 226 La. 117, 75 So.2d 28 (1954); Lieber v. Ouachita Natural Gas & Oil Co., 153 La. 160, 95 So. 538 (1922); Leonard v. Busch-Everett Co., 139 La. 1099, 72 So. 349 (1916). These circumstances furnished a reasonable basis for LIG to withhold payment until the dispute over the validity of the contract was settled. La.Civil Code art. 2040.
Accordingly, we find that insofar as Muller and LIG are concerned the Lawson Agreement is in full force and effect.
Upon the foregoing finding Muller's claim for six percent interest on the late payments is also denied. Although interest on late payments is provided for by the Lawson Agreement, the payments were not late. Muller refused to accept LIG's offer to make the payments on the condition that he acknowledge they were made pursuant to the Lawson Agreement. To the contrary, Muller at first denied that LIG owed him anything and insisted that they not send him any communication on the subject.
Notwithstanding Muller's position prior to trial that his gas was not produced and that LIG owed him nothing, we are convinced that from November, 1965, when gas was first received into the gathering system, Hunt was acting as Muller's agent and as operator of the gathering system, delivering Muller's gas to LIG's line. At that time Muller's gas was commingled with the other gas in the gathering system. Funds due to Muller during this time were applied by Hunt to the satisfaction of his share of the costs. After October 1966, when Muller repudiated the Lawson Agreement and terminated the appointment of Hunt as his agent, Hunt continued to gather gas in the same manner as it had before that time. Hunt also continued delivering the commingled gas, including Muller's, to LIG. Funds due Muller after October 1966 were placed in a suspense account. There is no other satisfactory explanation of the facts in this record.
Under the joint motion made between LIG and Muller at the trial it was agreed that if the Lawson Agreement was determined by the court to be valid, and that Muller's gas in the Lawson field has been produced and sold to LIG, the funds deposited in escrow would be the property of Muller, while the interest earned thereon would belong to LIG. We shall so order.
Muller now contends that the Court of Appeal erred in failing to hold that the filing of this suit, although styled a declaratory judgment proceeding, is really a concursus. And since this is a concursus, LIG has admitted liability for the amount deposited which should be turned over to Muller with interest and cost.
The deposit into the registry of court was not an admission of liability, as this is not a concursus proceeding. La. Code Civ.P. art. 4651. However, even if it were considered as such, it is not an admission of liability which precludes the assertion of a claim thereto by the party depositing the fund. La.Code Civ.P. art. 4652. Concursus is no longer limited to a stakeholder, or to an obligor who admits his indebtedness but does not know to whom a fund in his hands should be distributed. "The remedy may now be used not only to prevent multiple liability, but to prevent multiple litigation, and thus may be used by a person against whom multiple claims are asserted, although liability on some or all of these claims is denied." Comment, La.Code Civ.P. art. 4652.
Accordingly, it is ordered, adjudged and decreed that the judgment of the Court of Appeal is affirmed insofar as it holds the Ratification of Gas Purchase Contract and Liquified Hydrocarbon Purchase Agreement of May 10, 1965 to be in full force and effect; the decree of the Court of Appeal is otherwise amended as follows:
The funds deposited by Louisiana Intrastate Gas Corporation in the registry of the Court, and in turn made the subject of the escrow agreement, together with funds delivered to that account by Louisiana Intrastate *896 Gas Corporation since, are hereby decreed to belong to F. J. Muller; and the First National Bank of Crowley, Crowley, Louisiana, is hereby ordered to deliver the principal of said funds to the said F. J. Muller, all interest earned thereon is, in accordance with the joint motion authorizing said escrow agreement, decreed to be the property of Louisiana Intrastate Gas Corporation, and shall be delivered to said corporation by said bank.
It is further ordered, adjudged and decreed that Louisiana Intrastate Gas Corporation continue to pay H. L. Hunt, individually and as agent, for 100 percent of the gas delivered to Louisiana Intrastate Gas Corporation's line; the portion attributable to the interest of F. J. Muller in said gas to be computed by H. L. Hunt utilizing the same gathering, allotment and settlement procedure employed with the other parties to the Gas Purchase Contract and Liquified Hydrocarbon Agreement dated July 8, 1965, said fund due to the interest of said F. J. Muller, to be in turn remitted to Louisiana Intrastate Gas Corporation in accordance with the terms of the Indemnification Agreement entered into between H. L. Hunt and Louisiana Intrastate Gas Corporation; thereafter Louisiana Intrastate Gas Corporation shall pay said amount directly to the said F. J. Muller in accordance with the Gas Purchase Contract and Liquified Hydrocarbon Agreement dated July 8, 1965.
It is further ordered, adjudged and decreed that the right, privilege and option is reserved to the parties by agreement to settle, compromise, alter or amend this decree.
It is further ordered, adjudged and decreed that the right is reserved to the said F. J. Muller to demonstrate error, faults or oversights in the gas gathering, allocation and settlement procedures employed by Hunt or LIG since October 12, 1966 affecting his interest in the production.
All costs of these proceedings to be paid by defendant, F. J. Muller.
BARHAM and CALOGERO, JJ., concur.